UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


KALA B. WHITE,

        Petitioner,

v.                                Case No. 2:05-cv-241
                                HON. ROBERT HOLMES BELL
TIM LUOMA,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

      Petitioner Kala White filed this petition for writ of habeas corpus challenging the validity of his state court convictions arising out of multiple sexual assaults against four teenage victims. Petitioner's convictions resulted in six counts of first degree criminal sexual conduct, one count of second degree criminal sexual conduct and four counts of possession of a firearm during the commission of a felony. The Michigan Court of Appeals described the facts as follows:

> The evidence of defendant's guilt was overwhelming and virtually insurmountable. All four cases involved defendant approaching young teenage girls while in his automobile as the girls were either walking to school or heading home from school. Defendant would follow the victims, slow down, and then attempt to make some small talk with them or directly voice threats before brandishing a handgun and forcing the girls into his car. Defendant would drive around for a while, with the victims held captive in his vehicle, before stopping in a secluded alley where the sexual assaults would take place. The sexual assaults involved, in part, defendant forcing the girls, at gunpoint and under threat of harm, to engage in fellatio and to fondle defendant's penis. In two of the cases, defendant photographed his victim during the sexual assault with a Polaroid camera. Evidence of defendant's guilt included a confession to the crimes by defendant, identification of defendant's vehicle as being involved in the abductions and assaults, the victims' swift identification of defendant as the perpetrator in corporeal lineups and at trial, the discovery of the incriminating Polaroid photographs in defendant's bedroom, MRE 404(b) evidence of another consistent sexual assault that was not tried, and the

discovery of a handgun and a Polaroid camera in defendant's vehicle, which were present in the automobile when defendant was pulled over by police. Defendant denied any involvement in the sexual assaults and maintained that he was framed as part of a conspiracy. According to defendant, the evidence presented by the prosecutor in regard to the initial seizure of defendant, the confession, the search of defendant's home and vehicle, and the lineups and positive identifications, along with the testimony of the victims, was all predicated on lies by the victims and police and on police threats, coercion, and violence.

Petitioner received eleven separate sentences ranging from two years to life imprisonment.

Petitioner maintains that his convictions were obtained in violation of his federal rights. The respondent has filed an answer and has complied with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. The parties have briefed the issues and the matter is now ready for decision. In accordance with 28 U.S.C. § 636(b), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, I am recommending that this petition for writ of habeas corpus be denied.

Petitioner has raised the following issues in his petition:

I.    All of petitioner's convictions were obtained by the Wayne County Prosecutor's Office via using evidence that was either directly or indirectly gained by the Detroit Police Department as a result of unconstitutional search and seizure.

II.    The petitioner was denied effective assistance of counsel.

III.    The petitioner was denied a fair trial as a result of the Wayne Circuit Court's Chief Judge's refusal to disqualify the subordinate judge that presided over the petitioner's trial.

IV.    The petitioner was subjected to both an actual and constructive denial of effective assistance of counsel.

Pursuant to the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This provision marks a "significant change" and prevents the district court from looking to lower federal court decisions in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  To justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  Recently, the Supreme Court held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."  *Id.*  A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 412.  Rather, the application must also be "unreasonable."  *Id.*  Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable.  *Id.* at 410 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)).  Rather, the issue is

whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy,* 160 F.3d 1131, 1134 (6th Cir. 1998). The habeas corpus statute has long provided that the factual findings of the state courts, made after a hearing, are entitled to a presumption of correctness. This presumption has always been accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

Petitioner asserts that the evidence used against him in each of the trials was obtained as a result of an unconstitutional search and seizure. The Michigan Court of Appeals rejected petitioner's Fourth Amendment claims, explaining:

> Here, the police had a reasonable basis and probable cause to stop defendant's vehicle because of the improperly displayed license plate. The police testimony supported the factual finding that the license plate was improperly displayed, and we defer to the trial court's assessment regarding officer credibility, *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999). Thus we reject defendant's claim that the officers were lying. The objective fact that the license plate was improperly displayed overcomes any claim that the stop was a pretext. Moreover, even if the police pulled over defendant's vehicle ostensibly to investigate whether defendant was involved in the sexual assaults, we find that reasonable suspicion existed to support the stop, where defendant was driving a dark Pontiac 6000 with a license plate displayed in the rear window, which was consistent with the descriptions given by the victims. A dark Pontiac 6000, in and of itself, may have been insufficient, and an improperly displayed plate, in and of itself, may have been insufficient, but together the characteristics certainly gave rise to a reasonable belief or suspicion that defendant's vehicle was involved in the crimes such that further investigation was appropriate. Where reasonable suspicion is aroused, an investigatory stop is authorized for brief questioning.

Having legally stopped defendant for a brief detention, observation of the Polaroid photographs and camera in plain view and within defendant's immediate reach, along with observation of defendant's general physical characteristics, all of which evidence was consistent with the statements and accounts given by the victims, supported probable cause to arrest defendant and subsequently conduct an impound search of the vehicle and defendant's home pursuant to warrants.

Contrary to defendant's arguments, the police had a constitutionally valid basis to stop his vehicle and detain defendant, there was probable cause to take defendant into custody, a search warrant was unnecessary to stop the vehicle and to permit observation or discovery of the camera and photographs, the warrants that were subsequently obtained were valid and predicated on proper and accurate affidavits, there is no record basis for the claim that defendant was stopped merely because he is African American, and, in regard to the argument that the officers were lying, we defer to the trial court's assessment of credibility. The trial court's factual findings did not constitute clear error.

With respect to the *Sitz* argument, in which defendant maintains that the police could not simply pull over all Pontiac 6000s, the argument lacks merit. In *Sitz, supra* at 747, our Supreme Court ruled: "Because there is no support in the constitutional history of Michigan for the proposition that the police may engage in warrantless and suspicionless seizures of automobiles for the purpose of enforcing the criminal law, we hold that sobriety checklanes violate art 1, § 11 of the Michigan Constitution." Here, the police were not stopping *all* cars and searching for a perpetrator without suspicion as in *Sitz*, where all vehicles were to be stopped at sobriety checkpoints regardless of any suspicion of drunk driving. The Detroit police had a vehicle description that formed the factual basis for the investigation and stops. The actions of the police did not violate the principle set forth in *Sitz*.

In regard to defendant's claim that the trial court improperly refused to allow defendant to testify concerning suppression, the record reflects that defendant did indeed testify on the issue. The trial court allowed defendant to fully explain why he believed there was an unconstitutional search and seizure. Accordingly, the argument lacks merit.

Finally, defendant presents numerous suggestions for changes in existing law, e.g., all police cars should be equipped with audio and video recorders, the state should not permit warrantless searches of a person's mind, custodial interrogations should take place in front of a judge or magistrate, and independent basis analysis in regard to identifications should be precluded. We are not in a position to address these matters, nor are we authorized to make changes in existing law; rather, we are bound by the enactments of the Legislature and controlling precedent. We therefore decline defendant's invitation. As part of this argument, defendant appears to blend in substantive challenges to his confession and the corporeal lineups.

As to the confession, defendant claims that it was involuntary, given before *Miranda* rights were read, and fabricated.

In *People v Akins*, 259 Mich App 545,564; 675 NW2d 863 (2003), this Court stated:

> A statement obtained from a defendant during a custodial interrogation is admissible only if the defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights. A confession or waiver of constitutional rights must be made without intimidation, coercion, or deception, and must be the product of an essentially free and unconstrained choice by its maker. [Citations omitted.]

Our review of the testimony at the *Walker* hearing and the waiver of rights signed and initialed by defendant overwhelmingly shows that defendant was timely and extensively read and provided his *Miranda* rights, that the confession was voluntary without any force, intimidation, or coercion, and that the confession was not fabricated. Minimally, the trial court's factual findings were not clearly erroneous. *Akins, supra* at 563.

As to the corporeal lineups, defendant argues that the victims were shown photographs of defendant before the lineups and instructed to select defendant as the perpetrator. Our review of the testimony of the witnesses and the officers involved with conducting the lineup expressly reflects that no such improprieties occurred. The evidence shows that the police did not indicate or suggest in any manner whatsoever that defendant was the perpetrator and that the victims should choose defendant. To the contrary, the evidence established that the lineups were conducted fairly, objectively, and properly, with an attorney standing in to voice any concerns about problems with the lineups. No concerns were raised.

Petitioner argues that the Michigan Court of Appeals failed to address his primary argument that the Detroit Police Department seized every black male driving a Pontiac 6000 during the course of its investigation. In the opinion of the undersigned, petitioner's claim is subject to dismissal under the rule announced in *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court concluded that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482.

In *Riley v. Gray*, 674 F.2d 522 (6th Cir.), *cert. denied*, 459 U.S. 948 (1982), the Sixth Circuit interpreted *Stone* as requiring the district court to make two distinct inquiries in habeas proceedings:

> Initially, the district court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980). Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism. *See Boyd v. Mintz*, 631 F.2d 247, 250 (3rd Cir. 1980); *Gates v. Henderson*, 568 F.2d 830, 840 (2nd Cir. 1977) (*en banc*), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978).

*Id.* at 526 (footnote omitted). The record reveals no reason why petitioner would have been prevented from raising his Fourth Amendment claims in the state courts. Indeed, petitioner did have the opportunity to raise these issues in the state courts where they were rejected. Accordingly, in the opinion of the undersigned, petitioner is precluded from raising this claim under the rule announced in *Stone v. Powell*.

Petitioner asserts that he received ineffective assistance of counsel because his attorney tricked him into signing a consent for HIV/AIDS testing. Petitioner was required to have the testing whether he signed the form or not. As the Michigan Court of Appeals explained, there was nothing counsel could have done to prevent the testing and, more importantly, petitioner suffered no prejudice because the testing or the results of the testing were never disclosed at any of the trials.

> Because defendant was bound over to circuit court on charges of CSC 1 (MCL 750.520b) and CSC 2 (MCL 750.520c), and because the crimes involved fellatio and ejaculation, defendant was subject to an order for testing irrespective whether he consented to the testing. Counsel's actions in obtaining defendant's signature did not constitute a deficient performance.

> Moreover, defendant fails to show prejudice where the matter had no impact whatsoever on the fairness and outcome of the subsequent trials. It cannot be said that, had counsel not sought defendant's signature on the counseling and testing

- 7 -

order, there existed a reasonable probability that the outcome of the trials would have been different. Defendant's unfounded fears that a test result would be used against him and that his signature indicated he was conceding guilt, along with his claim of resulting mental anguish, simply do not support a finding that his right to a fair trial was prejudiced. There was no evidence presented at the four trials regarding defendant's execution of the counseling and testing order. Reversal is not warranted.

Similarly, the Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that he was denied a fair trial because the trial judge was biased and should have been disqualified. The Michigan Court of Appeals thoroughly analyzed petitioner's claims of judicial bias and rejected each claim, explaining:

> Defendant claims that the trial judge acted with bias and prejudice in not allowing defendant to address the court at a pretrial conference on September 11, 1998, where defendant wished to voice that there had been a complete breakdown of the attorney-client relationship and that counsel was acting inappropriately. The record reflects that the trial judge merely declined to hear and receive any comments by defendant because defendant was represented by counsel. In October 1998, defendant's counsel moved to withdraw and defendant indicated his approval to the trial judge; the judge agreed and ordered withdrawal and gave defendant several weeks to obtain new counsel. These events do not show actual bias or prejudice on the part of the trial judge but rather reflect appropriate judicial action. Moreover, the claim of improper conduct on the part of counsel, i.e. alleged trickery in obtaining signature on counseling and testing order, lacks merit for the reasons stated previously in this opinion.

> Defendant next claims that the trial judge acted with bias and prejudice in ordering a competency and criminal responsibility evaluation after defendant informed the judge that he had already been found competent to stand trial and despite the fact that defendant was in full possession of his faculties. The record contains a finding of competency by the Third Circuit Court Criminal Psychiatric Clinic, dated October 29, 1998, which is after the date on which defendant informed the judge that he had already been found competent. The record indicates, however, that there had been prior referrals for psychiatric testing. The prosecutor notes in its appellate brief

- 8 -

that a competency hearing had been held previously and that defendant had indeed been found competent to stand trial. The record reflects that, while the case was pending in the district court, a competency examination was conducted and defendant was found competent to stand trial. An insanity defense was not pursued at any of the trials by defendant following his decision to represent himself at trial.

The trial judge's referral for an examination, which defendant's counsel requested, cannot be deemed an act of actual bias or prejudice. The record suggests that the renewed request for a competency hearing was made because defense counsel felt it appropriate where he believed that defendant's mental health had deteriorated during incarceration and since the first competency hearing. Defense counsel stated "it's been brought to my attention that the defendant's state of mind is beginning to be impacted upon by the pressures and the stress of the particular ordeal." The judge's act of honoring defense counsel's request could not constitute an act of bias or prejudice but rather was a favorable ruling. Moreover, the act of a trial judge in referring a defendant for psychiatric examination to determine competency and legal responsibility does not constitute actual bias or prejudice against the particular defendant but is better coined an act of judicial responsibility and an effort to protect the defendant's rights.

Defendant next claims that the trial judge acted with bias and prejudice in appointing a standby attorney who was already assigned or appointed to represent another defendant in a CSC case. Defendant contends that the trial judge, knowing the tremendous workload of the standby attorney, appointed the attorney in an attempt to provide defendant with counsel who could not offer vigorous advocacy. Initially, we note that the record is devoid of information regarding standby counsel's actual workload. The record does indicate that the trial judge thought highly of standby counsel. Assuming that standby counsel had another CSC case to handle, it defies logic to suggest that a criminal defense attorney cannot handle two cases at any given time. Moreover, standby counsel was just that, standby counsel. He was appointed to provide defendant legal knowledge on issues of law as they arose during the trials, not to represent defendant and advocate on his behalf. Therefore, standby counsel's involvement in the case did not require in-depth preparation. The record does not support a finding that the particular appointment of standby counsel constituted an act of actual bias and prejudice.

Defendant next claims that the trial judge acted with bias and prejudice in refusing to address defendant's request to be placed in protective custody outside of the Wayne County Jail, thereby showing a complete disregard for defendant's safety. Although not entirely clear, it appears that defendant had already been removed and secluded from the general jail population by request of the district judge. The trial judge's decision not to order protective custody when requested indicated that the judge did not believe that defendant was in danger based on the judge's courtroom observations; it did not indicate that the judge was actually biased or prejudiced against defendant. All that exists is an adverse ruling, which is insufficient.

Moreover, the trial judge did in fact address the request as reflected in an order denying defendant's motion to be removed from the Wayne County Jail.

Defendant next claims that the trial judge acted with bias and prejudice in ignoring defendant's claim that he had been assaulted with feces and urine while detained in jail. Defendant asserts that the judge's indifference established that the judge is a "twisted, warped, and depraved human being." Again, the trial judge's action, or inaction, indicates a belief that defendant's claims lacked merit and were not worthy of belief based on the judge's courtroom observations. This does not constitute grounds for finding that the trial judge was actually biased or prejudiced against defendant.

Defendant next claims that the trial judge acted with bias and prejudice in not allowing defendant to discuss the claim that counsel had tricked him into signing the order for counseling and testing for disease and infection and in not allowing defendant the opportunity to question counsel at a subsequent evidentiary hearing on the issue. As held above, the issue concerning testing lacks legal merit. It was therefore not necessary for the trial judge to address the issue, or allow questioning on the matter. The trial judge's rulings were sound and did not reflect actual bias or prejudice against defendant.

Petitioner has asserted no valid reasons to justify the recusal of trial counsel. The Michigan Court of Appeals' decision was not contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner asserts an actual and constructive denial of effective assistance of counsel. Petitioner was initially appointed attorney Pitts. Petitioner formed a distrust of attorney Pitts and wanted him removed as counsel. The court granted petitioner's request and attempted to appoint another attorney for petitioner. Petitioner indicates that he never wanted to represent himself, but merely did not want to terminate his self-representation right. Ultimately, petitioner represented himself with attorney Winters acting as standby counsel. Petitioner argues that attorney Winters was inadequate because Winters wanted to pursue an insanity defense and was overburdened by his

caseload which included another appointment by the trial judge.  The Michigan Court of Appeals

rejected petitioner's claims in a very well reasoned decision stating:

> We now turn to the events occurring before and during the trials associated with issues of counsel.  On September 11, 1998, approximately six months before the initial trial, a pretrial conference was held in which defendant was represented by attorney Cornelius Pitts, and in which, defendant did not voice a desire for self-representation.  On October 23, 1998, a status conference was conducted on the record, and the trial court also entertained Pitts' motion to withdraw as defendant's counsel.  Pitts indicated that there had been a breakdown of the attorney-client relationship and he wished to withdraw; defendant noted his full agreement with Pitts' assessment and withdrawal.  Defendant indicated that he was considering a few other attorneys as possible future counsel.  There was no indication that defendant at this point sought to proceed pro se.  On November 13, 1998, another pretrial conference was held on the record, during which the following colloquy occurred:
>
>> *Defendant.*  I have decided to utilize my constitutional right to go pro se and represent myself.  And I would also like to take advantage of my constitutional right to receive standby counsel, a court-appointed attorney to aid and assist me in which I assure you will be an out-and-out effort to exonerate myself.
>>
>> *Court.*  Okay.  Such being the case, we will appoint Mr. Winters to represent you and/or aid in you representing yourself during the course of these proceedings.
>
> This was the full extent of the discussion concerning self-representation at the hearing.  Defendant had not presented a written request for self-representation, and the trial court's comments suggested that it had not definitively decided to allow defendant to proceed pro se, but rather it was simply appointing attorney Winters as either defendant's actual counsel or as a standby attorney for defendant.
>
> At a November 20, 1998, pretrial conference, the trial court stated:
>
>> Mr. White, as you know, I believe it was last week, you indicated you had not retained counsel to represent you.  I indicated that I have appointed Mr. Winters, who is a very experienced and distinguished member of the criminal defense bar here, to represent you and/or assist you in preparing your case.
>
> Subsequently, the following pertinent colloquy took place at the hearing after defendant's attempt to personally address the trial court.

*Court.* You're not going to make any statements to me unless you have first discussed it with Mr. Winters. Do you wish to have Mr. Winters represent you or assist you?

*Defendant.* Well, I wanted assistance, not representation.

*Court.* Okay. He will assist you, therefore.

*Defendant.* Excuse me, your Honor. But as far as this particular attorney representing me, I have no problems with him personally or anything like that. But he didn't come to see me during this week. And therefore, we haven't been able to make each other's acquaintance. And I do not have any knowledge of this man or his intentions for me.

And, therefore, I would have to at this time ask to receive a new Court-appointed attorney to act in his place.

And also sir, I would also like to make a statement that I was very upset that I didn't receive the immediate gratification of not only my request or my motion to be allowed to represent myself in all and any courtroom proceedings– .

*Court.* Okay. First of all, Mr. White, I do not wish you to discuss any matters with respect to your case without having had the opportunity to discuss it beforehand with Mr. Winters who is going to be assisting you in the preparation of your defense and trying the case. . . .

Later in the hearing, attorney Winters referenced himself as defendant's standby attorney, and defendant made the following statement.

Okay, well, first of all, your Honor, all right. I have never received a formal reply on my motion for self-representation, which is my constitutional right to do so.

I also understand MCLA also allows me that right and the Michigan Constitution, sir. And I've already undergone two competency examinations against my own will. And I, I'm still not receiving any acknowledgment in this courtroom. I'm still being silenced and hushed even though I approach you and everyone else with the utmost respect.

I feel my rights are still being violated at this present time. I don't know if you heard me tell you that I didn't see my attorney any time

- 12 -

this week until today about a half an hour ago before coming into this courtroom.

And I did in fact, did in fact motion for another attorney. . . .

But you're steadily pushing, pushing, pushing forward when you haven't dealt with the situations that I've already brought to your attention.

At this time, I would like to formally, because I was informed that the reason why you may not have issued, or granted that motion for self-representation is because it wasn't in writing.  And I did take the time, though I wasn't sure if I was going to be brought here to this courtroom today, I did take the time to write out a written motion, sir, about my, my request to receive the right to represent myself in all and any courtroom proceedings.

And I would like to know since this is written in pencil and after I submit it, it can be erased and altered, I would like to know if I could verbalize it first and make it a matter of court record in two different forms.

The trial court responded by stating that all motions would be heard in January 1999, and Winters interjected, stating:

Mr. White is indicating, he does indeed wish to represent himself.  I will be available as his standby attorney.  I will not be addressing the Court, the jury or any of the parties involved in this case.  Mr. White will represent himself.  I will be available for consultation, to answer any questions.

The trial court then engaged defendant in a short examination.

*Q.*  It's my understanding, based upon Mr. White's statements this morning, that he wants to represent himself and have Mr. Winters assist him.  Is that correct, Mr. White?

*A.*  Correct, sir.

*Q.*  Okay.  Do you understand that you have a constitutional right to an attorney, to have this Court appoint an attorney to assist you and try this case for you?  Do you understand that?

*A.*  Yes.  I'm fully aware of that.

- 13 -

*Q.* Okay. And is it your own decision of your own free will to try this case, to represent yourself?

*A.* Yes, sir, your Honor. . . .

* * *

*Q.* Have there been any threats or promises made to you to get you to relinquish your constitutional right to have this Court appoint an attorney–

* * *

*A.* No. No.

A hearing on numerous motions was held on February 5, 1999, and the first motion addressed by the trial court was defendant's motion for self-representation. At the hearing, the trial court expanded its discussion from the earlier hearing regarding self-representation, and the court conducted an examination of defendant on the matter.

*Q.* And it's my understanding that you wish to represent yourself through the course of these proceedings, is that correct?

*A.* Correct.

*Q.* Okay. Has anyone made any promises towards you or threats towards you to, for you to give up your right to counsel? This is something you want to do yourself?

*A.* For me to represent myself?

*Q.* Right.

*A.* I haven't given up my right to counsel. I believe he's standby counsel.

* * *

*Q.* So, you wish to represent yourself and have Mr. Winters available to you, is that correct?

*A.* True.

- 14 -

*Q.* All right.  You do know you have a right to counsel in this matter, is that correct?

*A.* Yes.

*Q.* All right.  And you have the right to have an attorney represent you, argue on your behalf, question witnesses on your behalf, you understand that?  Is that right?

*A.* Correct.  You mean. . . .

*Q.* You have, you have the right to have an attorney come up and argue these motions for you, give an opening statement at trial, question witnesses –

*A.* Oh, I was going to serve as my own attorney.

*Q.* Yeah.  But you understand that I could appoint an attorney to do that for you?  Do you understand that?

*A.* No, I don't.  I don't see the relevance of –

*Q.* No.  Just you understand that I could, if you so desired, appoint an attorney to represent you who would question witnesses, give statements to the Court on your behalf?  Do you understand that?

*A.* Oh, I wouldn't prefer to do it that way.

*Q.* I know.

*A.* Oh, yes.  I understand that I have that right.

*Q.* Okay.

*A.* Yes.  Under the Constitution of the United States of America.  Yes.  I am aware of that.

*Q.* And again.  You wish to have this Court waive your right to have representation, is that correct, outside of Mr. Winters being available to answer any questions you may have?

*A.* Outside of having standby counsel, correct, sir.  I'm not saying what form or who that standby counsel will be at this time, but correct.  I would like an attorney by my side to answer any questions

- 15 -

that I may have during the course of this trial and any pretrial proceedings or hearings.

*Q.* Okay. Are you aware that there are certain dangers, Mr. White, are you aware that there are certain dangers and disadvantages of representing yourself? Do you understand that?

*A.* Certain dangers and disadvantages?

*Q.* Yes. For instance, you don't have a legal education. You understand that?

*A.* Correct.

*Q.* And an attorney such as Mr. Winters has tried hundreds and hundreds of cases, but this is–you haven't tried any cases, have you?

*A.* No, I have not, sir.

*Q.* You understand you're not experienced in the practice of law, is that correct?

*A.* I do believe I mentioned that in the motions. However, I do have knowledge going beyond just general knowledge concerning the law and the practice of law.

*Q.* Did you, did you attend high school?

*A.* Yes, I did.

*Q.* Where did you attend high school?

*A.* Northwestern High. Well, the first year I went to Cass Tech, got kicked out of Cass Tech, went to Northern, then I went to Northwestern High.

*Q.* Did you finish Northwestern?

*A.* No, I didn't.

*Q.* You can read and write, can't you?

*A.* Sir, I think that's quite apparent by this time.

- 16 -

*Q.* I think, Mr. White, it's certainly apparent to us that you write and you write pretty well.  And it appears to this Court that you're also very articulate.

*A.* Thank you, sir.  I take that as a compliment.

*Q.* All right.  Pursuant to *People v Mack*, 190 Michigan Appeals, 7, a 1991 case, it certainly appears to me that Mr. White has knowingly, intelligently and voluntarily waived his right to representation.

However, again, as I've noted previously on the record, Mr. Winters will be with Mr. White during the course of these proceedings should he have any questions or anything at all that he needs to discuss with Mr. Winters regarding the questioning of witnesses, trial strategy, et cetera, unless the People have an objection.

*Prosecutor.* No.

*Court.* All right.  Mr. White, your first motion is granted.

Later in the February 5th hearing, the trial court addressed defendant's motion for a different standby attorney in order to obtain, according to defendant, effective assistance of counsel.  The trial court denied the motion, asserting that attorney Winters had a stellar reputation and would serve defendant well.  Orders were entered by the trial court granting the motion for self-representation and denying the motion to replace or substitute standby counsel.  The trial court also denied a motion seeking its disqualification.

On February 23, 1999, a hearing was held before the chief judge in a challenge to the trial judge's denial of the motion to disqualify.  The chief judge did not enunciate any rights related to self-representation.  We do note that the chief judge, as part of a general discussion regarding defendant's apparent refusal to consider a guilty plea offer and the representation by Cornelius Pitts, stated:

> I represented a lot of people as a defense lawyer, and I represented a number of people charged with multiple cases of a serious nature that carried life in prison, and when that happens sometimes, among other things, the lawyer's obligation is to talk to the prosecutor maybe to see if something can be worked out, because if you were to be convicted on any one of these cases, and if the Judge was duly impressed with the severity of your conduct in these cases, assuming you were guilty, it is reasonable to expect that the sentence that would be imposed would be much greater than the 17-year minimum.

- 17 -

> And when you add up all these cases, you might end up with the kind of sentence that would virtually guarantee that you might not see the light of day.

On February 26, 1999, a hearing was conducted in order to address some additional motions filed by defendant and to allow the court to discuss the mechanics and procedures related to voir dire and trial, which was scheduled for the following week. The trial court again reminded defendant that he was a layman without legal experience and not educated in law, and, therefore, defendant could be at a disadvantage. The trial court additionally informed defendant of his right to an attorney and again noted that attorney Winters is a very experienced counselor. Defendant responded, stating: "I'm representing myself just fine." The trial court then indicated that Winters would be available to defendant as a standby attorney during trial. The trial court asked defendant a second time whether he was sure he wished to represent himself, and defendant responded affirmatively. Defendant again expressed his desire to have someone other than Winters act as his standby attorney, asserting that Winters was not sufficiently interested in the case and that Winters had another similar case that required his attention. Defendant maintained that he was "uncomfortable" with Winters. The trial court answered, stating:

> [I]'m not going to ask Mr. Winters to step away because, A, he's a very bright criminal lawyer, very experienced. And he's been with us through the course of these proceedings. And we are starting a trial next Tuesday and we will be conducting certain evidentiary hearings on Monday. So, that's the position of the Court.

On the day before trial, an evidentiary hearing was held on matters involving the waiver of the preliminary examination and suppression of defendant's statements to police (*Walker* hearing). The trial court did not initiate the hearing with any references to self-representation. The following day, the evidentiary hearing was continued and concluded and the trial then commenced. At the beginning of the day, the trial court briefly questioned defendant.

> *Q*. Again, Mr. White, as I mentioned to you yesterday, there are inherent dangers in representing yourself in that you do not have legal training as well as the usual legal skills associated with trying a case and conducting a capital offense case. Is it still your desire to represent yourself?
>
> *A*. Yes.

The transcript of the second day of trial reflects no discussion by the trial court regarding self-representation prior to trial continuing. The transcript of the third day of trial reflects that, prior to testimony commencing, the trial court asked defendant

- 18 -

if he still wished to represent himself, and the defendant responded affirmatively. The transcript of the fourth day of trial reflects no discussion of self-representation prior to proceedings commencing. The transcripts of the fifth, sixth, and seventh day of trial reflect that the trial court asked defendant if he still wished to represent himself, and defendant responded affirmatively. The trial court also indicated, on each of those days, that defendant could confer with Winters if necessary. The transcript of the eighth and final day of trial reflects that the trial court made no mention of self-representation. During the course of the first trial, a hearing was held before the chief judge on yet another motion for the disqualification of the trial judge. The chief judge made no reference to matters concerning self-representation.

With respect to the second trial, the trial court commenced the first day of trial by again asking defendant if he wished to represent himself, and defendant responded that he so wished. The trial court also noted that defendant could confer with Winters if necessary, and the court cited the statute and some case law regarding self-representation. The trial court further threatened that should defendant make reference to the conviction in the first trial, the court would likely preclude defendant from continuing to represent himself. On each day of trial, except the final day on which the jury returned its verdict, the trial court asked defendant if he wished to continue representing himself, and it informed defendant that he could confer with Winters when necessary. Defendant responded each day by stating that he indeed wished to continue representing himself.

The third trial was not conducted until about a year after the second trial has concluded. During the interim, a few hearings were conducted. On August 20, 1999, a hearing was held on several motions filed by defendant, including another motion to disqualify the trial judge. At the hearing, the trial court informed defendant that he was appointing a second standby attorney, aside from Winters, for purposes of the last two trials. The trial court did not make any references to issues regarding self-representation. On September 27, 1999, a hearing was held to set dates for pretrial motions and the trial itself. The trial court did not engage in any discussion concerning self-representation. Pretrial motions were held on February 11, 2000, and the trial court granted defendant's motion to have a personal investigator appointed to assist in the defense. The trial court also granted defendant's request to have attorney Winters locate a private investigator. The trial court once again denied a motion for disqualification. There was no mention of any matter concerning self-representation.

The day before the third trial commenced, the trial court conducted *Walker* and *Wade* hearings. The trial court initiated the proceeding by discussing rather extensively defendant's choice to proceed in propria persona at the hearings and the third trial. In response to direct questioning from the trial court, defendant indicated that he wished to represent himself, that he understood that Winters could be appointed to conduct the trial, that he recognized the inherent dangers in representing himself as

those dangers were explained to him by the trial court, that no promises or threats had been made in order to obtain his waiver of counsel, that the choice to proceed pro se was made freely, and that he did have the opportunity to conduct research in preparation for trial. The trial court noted its belief that defendant was literate, competent, and understanding, and that the waiver of counsel and assertion of the right of self-representation was made knowingly, intelligently, and voluntarily. The trial court informed defendant that Winters and his associate would be available to confer on issues as they arose if necessary. The court asked defendant if he had the opportunity to talk about self-representation with his father, and defendant replied "[f]rom time to time." The trial court told defendant that it would accommodate defendant should he wish to discuss the matter any further with his father. The court informed defendant that if he should change his mind about self-representation, defendant needed to tell the court. Defendant acknowledged understanding his right to change his mind and request representation. The trial court concluded by citing constitutional provisions and case law that addressed self-representation. Trial three was conducted over six days, and the trial court did not reference or discuss self-representation prior to trial commencing on those days.

On the first day of trial number four, the trial court questioned defendant concerning self-representation. In response to direct questioning from the trial court, defendant indicated that he wished to represent himself, that he understood that Winters and the associate attorney were available for consultation should the need arise, that he recognized the inherent dangers in representing himself as those dangers were explained to him by the trial court, that no promises or threats had been made in order to obtain his waiver of counsel, and that the choice to proceed in propria persona was made freely. The trial court found that defendant had invoked his right to self-representation, pursuant to the Michigan and United States Constitutions, and did so knowingly and intelligently without threat or promise. The trial court did not reference or discuss self-representation prior to testimony commencing on the following five days of trial.

*Discussion*

We first hold that the invocation of defendant's right to self-representation during all four trials and pertinent hearings was unequivocal. Following the withdrawal of attorney Pitts, defendant was adamant throughout the lower court proceedings that he wished to represent himself, and in fact he became angered at the trial court when the court initially acted in disregard to the request to proceed pro se by making defendant confer with Winters before speaking.

In *Faretta v. California*, 422 U.S. 806 (1975), the United States Supreme Court held that a criminal defendant has the right to conduct his own defense at trial. The Court stated:

- 20 -

It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." *Illinois v. Allen*, 397 U.S. 337, 350-351, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353.

*Id.* at 834.

The Court held that a criminal defendant must knowingly and intelligently forgo his right to counsel. The Court stated:

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. *Johnson v. Zerbst*, 304 U.S., at 464-465, 58 S.Ct., at 1023. *Cf. Von Moltke v. Gillies*, 332 U.S. 708, 723-724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann*, 317 U.S., at 279, 63 S.Ct., at 242.

Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure. We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

*Id.* at 835-836.

In *Martinez v. Court of Appeal of California*, 528 U.S. 152 (2000), the United States Supreme Court held that a defendant does not have the right to represent himself during his appeal if the state appointed counsel for the defendant. The Court noted that the *Faretta* decision did not recognize the right of self-representation as absolute.

- 21 -

> The defendant must "voluntarily and intelligently" elect to conduct his own defense, and most courts require him to do so in a timely manner.  He must first be "made aware of the dangers and disadvantages of self-representation."  A trial judge may also terminate self-representation or appoint "stand-by counsel"–even over the defendant's objection–if necessary. . . .  Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.

*Id.* at 161-162.  Petitioner has failed to show any violation of federal or constitutional law.  The record clearly shows that petitioner knowingly and intelligently waived his right to counsel.  The Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

In summary, the undersigned concludes that petitioner's claims are without merit and therefore recommends that this Court dismiss the petition with prejudice.

In addition, if petitioner should choose to appeal this action, I recommend that a certificate of appealability be denied as to each issue raised by the petitioner in this application for habeas corpus relief.  Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted.  A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court

- 22 -

in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, the undersigned has examined each of petitioner's claims under the *Slack* standard.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  The undersigned concludes that reasonable jurists could not find that a dismissal of each of petitioner's claims was debatable or wrong.  Petitioner's evidentiary and Fourth Amendment claims are barred, petitioner was not denied effective assistance of counsel regarding his consent for HIV/AIDS testing, petitioner was not entitled to the recusal of the trial judge, and petitioner was not denied his right to have effective representation of counsel.  Therefore, the undersigned recommends that the court deny petitioner a certificate of appealability.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  November 10, 2008

- 23 -